Good afternoon ladies and gentlemen. We have five cases on the calendar this afternoon. Two patent cases, one from the district court, one from the trademark office. An international trade case, two government employee cases, one of which was submitted on the regional telephone on Biazi. The first case is Third Wave Technologies v. Stratagene, 06-1209. Mr. Lee. Thank you, Your Honor. In the streets of court, my name is William Lee. Together with my partner, Lisa Pierazzolo, I represent the public strategy. With the court's permission, I would like to address three issues today. First, the issue of preservation of objections to the court's claims construction. Second, the correct construction of the providing and mixing steps of the asserted claims. And third, the issue of damages, particularly given that in this case, the jury was expressly informed that an injunction was issued, and that therefore, the period of the hypothetical license was only 18 months. If I turn to the first issue, the issue of preservation, or stated conversely, the waiver of objections to the court's claims construction, I think the court could fairly characterize the parties' briefing as if so and if it's not. And to sort through that, I'd like to focus the court on three clear portions of the record. One from strategy, one from PWT, and one from the district court. First, at appendix page 726, the court will find that strategy specifically argued that the oligonucleotides, that oligonucleotides that are synthesized during the reaction or mixing step cannot satisfy the second oligonucleotide required, But Mr. Lee, that sounds like an infringement issue, rather than an up-front, forthright challenge to claim construction. And it's part of a section 5, which really deals with infringement. That doesn't sound like an up-front claim construction challenge. Well, Your Honor, two responses to that question. The first is, it is, and it is because this was a summary judgment motion brought by PWT on infringement. That necessarily, under this court's decisions, implicates both claim construction and then the application of correct claim construction to the facts. Don't you need more than implicates? Don't you need a little charge? Your Honor, I would suggest that in this specific case, where there had been an earlier claim construction in another case, that had been settled a year before this case, this motion came to be heard, that it was enough. The standard is fair notice to the court and the other party. And if I could, Your Honor, focus on what was said, the statement at page 10 of 726 is, quote, the oligos cannot be, quote, provided, close quote, as defined by the patents in suit unless they exist. Now, to go to Your Honor's question, the second part of my answer to your question is, I don't think that there was ambiguity either on the part of PWT or the district court. Because in response, what PWT said in appendix case 742 is this. In arguing that the second oligonucleotide cannot be provided as required by this sort of claim, strategy essentially rehashes the argument presented and rejected by this court in the prior litigation. And then goes on to say, the court ruled on claim construction that, quote, claim reagents were not required to be provided fully formed before the limitation initiation and mixing step. In other words, the best you can do in setting out a challenge to claim construction is to indicate what your opponent, how your opponent characterized your views. No. Because, Your Honor, I think the first page, if I draw your attention to page, appendix 726, we have an explicit statement that the oligogos cannot be provided as defined by the patents in suit unless they exist. I then, Your Honor correct, respond with their characterization of that. But then the most important thing, Your Honor, is the court's statement in response to both arguments at page appendix 617. There is no language in the claim requiring any of the ingredients to be fully formed when they are added to the mix. So whatever each of us has said in the briefing, there is a clear statement of what providing means as defined by the claims. Mr. Lee, let me ask you one- Surely. Let me ask you one question if I could. You, in saying that you, that the claim construction issue in the race book, you did not point to pages 709 through 713 and 730 through 733. In particular, 732 through 733. Now, you and Mr. Panos obviously know more about precisely what happened in the district court than I do. But I would have thought you would have mentioned in support of your argument those pages. Was there a reason you didn't, in other words, for those pages that I just mentioned, not in fact address this claim construction issue? Your Honor, what we cited here specifically were, and Your Honor is correct, because one of the points we tried to make, perhaps not as effectively as we could, is there are sections of our brief called claim construction. Sections of QWT's brief called claim construction. Sections of the court's opinion called claim construction. That's in part what Your Honor has drawn our attention to. What we specifically tried to cite in the pages that I'm trying to bring to the court's attention are, one step down, which is having raised the issue of claim construction as part of the infringement inquiry, did we make the specific argument that the providing, mixing steps are separate steps, and that the providing needs to be completed before you can mix said first allego, said second allego, said claimant's needs. And so I think all of those go to that. Now, Mr. Fallon, in fairness, was there at the trial. I wasn't, so he may even know more. But are you saying that the pages I cited aren't pertinent to that? Because 709 through 713, you know, you've got about four pages there laying out claim construction law. And then at 730, and you can conclude at 713, I guess, with claim construction argument. Then at 730 and 733, there's more. Is that particular claim construction issue not pertinent to what you were discussing with Judge Lurie? No. Those pages, that entire section is pertinent to this issue because that was the core of what people were citing. In fact, Your Honor, the pages that fall in between the pages you cited are building upon what happened before page 724, making a specific argument, and then moving on. And in fact, as Your Honor will see. So the pages I noted you would say are pertinent? They are relevant, without a doubt. And I think fairly, the briefing looked at as a whole, the parties did what this court has talked about. They argued the correct claims construction. There was the fact that there had been this earlier claim interpretation. But they then moved to how it would apply in this case. But Mr. Lurie, with respect to the waiver issue, aren't there really two elements? Not only the mixing aspect, but also the temperature? Is there a waiver of the temperature issue? There is, Your Honor. But part of that confusion is this. There was an argument about whether the providing step required that the oligos be preformed before the mixing step. Even after that was decided, there was a question about the temperature issue in thermal cycling and whether that still created a non-infringement argument. The focus of our argument to you here today is the former rather than the latter. And I think I can say three things in response to Your Honor's question. The structure of a claim, which sets forth a providing step, a mixing step, that specifically describes mixing said oligos, referring back to the providing step, and referring to temperature conditions, is very inconsistent with our claim interpretation. In fact, you do have to have temperature conditions that allows the annealing and the cleaving. And we've never suggested otherwise. Our only argument is that as these claims are structured and written, the providing step has to be completed first. Under the district court's claim interpretation, which is conceivably broader, the second point, you could have just had the claim read, mixing a first oligo, a second oligo, clean the structure, and put it right exactly the same way. The second point I would make is that interpretation, which has preformed polyigos provided first, but under temperature conditions when mixed that allow annealing and cleavage, is consistent with all 26 of the examples of the invention that are described in that. So would you limit it to those 26 examples? I don't know. I would make that argument. I think that under Phillips, those 26 examples are constructive. And if you take, I would take three things from there. I would take the structure of the claims themselves, recognizing that under broader interpretation, adopted by the district court, you might render the providing steps superfluous. In fact, the seds in the second step become somewhat of a mystery. With that structure in mind, I think we would ask ourselves, is that interpretation that we've provided consistent with the specification? And the answer is it is because the examples that are there of the invention, there are many examples of different things in this very long patent, but there are 26 of this claimed invention. They are all consistent with that interpretation. And then other portions of the specification actually criticize methods like polymerase chain reaction, like TAP man, where you would actually be synthesizing as part of the mixing process. And they're criticized for creating unwanted cleavage products, exponential amplification of those non-uniform cleavage products. And then probably most importantly, the specification says our invention to avoid all of that is to uncouple synthesis from this mixing reaction. That's consistent with our kind of interpretation. And then your own, the final history, although not as unambiguous as the specification, talks a little bit about the temperature conditions that your honor described and said, this invention allows for recycling. Polymerase chain reaction and TAP man don't need recycling. They're generated, they're all of those as part of the process. But all of those processes are done at a certain temperature. Temperature is a very critical element, isn't it? Critical is, for sure, it's a critical element. But your honor, temperature would be a critical element, whether you preform the oligos and then add them, because you still need the conditions for the cleaving product. Or form them during the mixing process. Right. So the temperature condition is going to be critical under either of our claims. It is, and therefore is not directly relevant or precisely relevant to the issue I'm urging upon the court, which is whatever the temperature conditions are for the cleavage reaction, this claim is structured in a manner so that it's fairly red, actually expressively red. You provide first, you mix second, and then you get your cleavage structure. Third, and that's consistent with the specification to directly answer your honor's question. I don't think you can limit it to the 26. I think they're just constructive. And a very small portion of the file history that addresses that is consistent with that. But each one of those 26, though, there is a providing step and a mixing step. Right. And there's a preform providing step. There's a mixing step. And then, interestingly, I think they pointed out, there is a description of subsequent steps to the mixing step, even in several cases. I'm into my rebuttal time, so let me just add one thought on the issue of damages. This case is different than many because the jury was explicitly informed that an injunction was issued. Indeed, it was TWT's witness who told the jury that an injunction was issued, and the damage period, therefore, was only 18 months. That's, in fact, what happened after the verdict, the injunction was issued, and the product went off the market. This is a case in which the actual sales are $500,000. The projected sale is on one document that everyone relies upon, at appendix page 3004, and the projected sales of $1 million. Yet there's a jury verdict, which has now been troubled with attorney's fees on top of it, of close to $6 million, most of them out in front of the fee. There is nothing that would justify that. It is grossly excessive. The idea that we would want to get a foothold in the diagnostic market makes no sense. That's what TWT says to you in their briefings. Well, you would have gotten a foothold, and then before the injunction issued, you would have redesigned your product to be non-infringing and stay in the market. Well, if that were true, we just would have redesigned our product, put the non-infringing product in the market, and gotten our foothold that way. Thank you. Mr. Lee, we'll give you back your three minutes in rebuttal because we've asked a lot of questions. Mr. Powles, you're representing Third Wave, and no doubt you'll be out to win a waiver. Yes, Your Honor. Mark Powles on behalf of Third Wave, with Eric Otteson also. And I will start with waiver, Your Honor. And there is a flat, clear waiver in this case. The question presented by strategy and poor appeal on claim construction is whether the court erred in constraints on mixing to complete a process in which the required elements would be effectively made during the mixing step rather than being provided before hand. It's clear that they had a different view of the claim construction than what the court did, isn't it? I don't believe so, Your Honor. I think what they were doing was setting up what they thought was going to be a strong anticipation argument. And they thought they'd take this claim construction, maybe thinking they could undo their waiver later. But I think it's, from the evidence we cite on summary judgment, they clearly stated the providing step could be satisfied provided, or if, to avoid using that word, if the components are provided before the end of the mixing step. They didn't require that the, and they were explicit in their terms. They did not require the components to be provided before the start of the mixing step. And that's really where the dispute comes down here. There is a flow to these claims, providing, mixing, detecting. But the issue is, do you have to provide all four before you start mixing? Or can you provide two, mix those and provide the others during the mixing step? That's really the dispute. And they expressly waived an argument on claim construction that provided it had to be completed before mixing started. That's what the argument is. I have no doubt that if you had been representing strategy, I know Mr. Lee had been representing strategy, well, we would have seen very clear claim construction arguments. But that did not take place here. Certainly, the claim construction arguments were not presented as you or probably Mr. Lee would have presented. But it does seem that when you take all the portions of the record that Judge Lurie discussed with Mr. Lee and that I discussed with Mr. Lee, and some provisions of the district court's opinion, and the parts of it, for example, at 633 through 634, and I think 654 through 655 and 56, it's hard for me to escape the conclusion that inartifully, perhaps, the claim construction argument was advanced, number one. And number two, that third wave and the district court recognized it was being made. That's kind of where I am at. Where am I wrong on that? I'm not asking that in an argumentative sense, but trying to sort of frame the question. I understand. We did say in our reply brief on summary judgment that there were rehashed claim construction arguments. And they did. They rehashed arguments on complementary and what was required to be fully complementary and what was required to form the cleavage structure. And that's part of what Your Honor, that's part of the briefing that you asked Mr. Lee about. It's part of what the court's opinion is addressing here. It's not the providing before mixing. It goes to whether, to the relationship between the oligonucleotides that are annealed to the target. And there's talk about an enzyme that displaces the downstream oligo and moves it out of the way. And in the 3.4 patent in particular, that oligo has to be able to come back and anneal or hybridize or bind to the target. So you're saying, excuse me if you're running, but you're saying that what's 7.12 through 7.13, 7.09 through 7.12 is just general claim construction argument. And what's a 7.30 through 7.33, yes, it's a claim construction argument, but not the one that's now heard. So you disagree with Mr. Lee, because he said it was pertinent. I do not believe it is pertinent. It's not clear to me it's a claim construction argument more than a non-infringement argument. Here's what they're saying. At these stages? Yes. What they're talking about is this enzyme. And this enzyme moves along and it builds on the upstream oligo. So it makes it long. And as it does that, it moves away the downstream oligo. It displaces it. In their system. That's what's being discussed. That's what happens in their system. Okay. They're saying, well, if that infringes, then the patents are anticipated by TaqMan. Because in the TaqMan reaction that you're actually talking about more than you thought you would about, what happens is there's a big enzyme, and it moves down. It's just one as opposed to two in the strategy system. Exactly. Exactly. There's one enzyme as opposed to two. And what happens is as the TaqMan enzyme moves down, it makes that upstream oligo longer. But when it reaches the other one, and this is what's in the Hollenberg, it chews that down. But they're saying if we're covered, then it must cover TaqMan. Because the structure should be the same. The answer to that is that's wrong. That's an infringement issue. And it's wrong. Because what happens and what the district court found is their enzyme falls off. And when that enzyme falls off, what can happen, and the only remaining question for trial, was whether the downstream oligo comes back down. That was the only reason we didn't get summary judgment in the briefing. And in trial, we proved that that happened. So this isn't going to the providing-before-mixing argument, as I understand what you're saying. And the providing-before-mixing argument is the argument waived in the context of the summary judgment briefing where they explicitly said as long as it's done prior to completion of mixing, that claim limitation is satisfied. Is that the only item on waiver that you agree with? What about temperature? I think the temperature argument was waived. They appear to agree now that you can have temperature variations during the mixing step and that that's acceptable. There's some question in my mind as to whether they're saying the mixing step ends at some point in time. But on the reply brief, they've come back and said, no, you can have reaction conditions including temperature changes. They do say, but you can't have temperature changes that would allow making an oligo during the mixing step. That goes back to providing-before-mixing. So I see that as the only issue they ask for review on, and I see that as the issue, is they're providing-must the providing step be completed as the all four components before the start of the mixing? That's the issue. What would happen is if the providing step was not there? If the providing step- If you eliminate the providing step in the process. If the providing step weren't there, you wouldn't have definitions of target nucleic acid, first oligo, second oligo. So you would have to provide the oligo before mixing? No. You have to provide-I may have misunderstood your question. Each component needs to be provided before it can be mixed. I agree with that. But not every component has to be sitting there on a lab bench or something before you mix any two of them together. And I disagree with the comment Mr. Lee made about the examples. There are-the examples do not specify that all four are sitting there, done, ready to be combined, sitting on a lab bench. They say, mix two of these together, and then add these. They don't say that the synthesis is completed on those others. They don't require that the synthesis be completed on those others. So does the-all the time it has to be fully formed prior to the mixing step. Isn't that the real crux of the issue? The real crux of the issue is, does every component have to be fully formed before you start any aspect of the mixing step? That's as precisely as I can say, but I think there are-that's the issue they weigh. But I'd argue as well, just from the language of the claim, there is a flow of the claim, providing, mixing, detecting, as I said before. They seem to really put a lot of emphasis on the word set. It appears in the mixing step, refers to said first oligonucleotide, said second oligonucleotide. If you look at the providing paragraph, there are romanettes in there. One, two, and three in one of the patents, one, two, three, four in the other. And in each of those, one will define the target nucleic acid. The next one comes back and says, first oligonucleotide with certain properties relative to said target nucleic acid. They don't even argue that you have to provide in the order specified in those romanette numeral steps. That wouldn't be logical. They don't argue that. The examples don't do that. So, there is a-the word set isn't going to carry the day. The Altiero case came down and said the word set doesn't carry the day. And it doesn't carry the day here. It doesn't refer back to the mixture, of what's in the mixture, does it? It refers to the target in defining the properties, yes. But it doesn't say you must have that present before you mix two of the other things. Yeah. How can you mix the cleavage means, the target, first oligonucleotide, and second, if you don't have them? Well, unless I'm going to all add them simultaneously all at once, which they don't argue is required either. And one of the patents says- Well, Einstein said it's an anti-order, so you add 4, 3, 2, 1. That's correct. 1, 2, 3, 4. Yes. So, before you mix one, you have to have it. I will agree with that completely. But that doesn't mean before you mix two of them, you have to have a number of 3 and 4. That's what their construction would require. It would require 1, 2, 3, 4, all lined up, ready to go. Aren't they saying that you can't have them generated in situ, in a reaction mixture? There's a nuance to their argument that goes that way. But what they're arguing is that they have to exist fully formed beforehand, before the mixing step starts. Regardless of how you're going to make it, whether you make it chemically or enzymatically, they have to exist fully formed beforehand. That's their argument. And I would argue that's completely illogical, because if somebody's practicing this method- It's not a matter of logic, it's a matter of reading the claim. Well, it's both, under Althaeus and under case law. It's a matter of the language. And language, on its terms, doesn't dictate an order. There's no then, there's no thereafter. You don't see the kind of language you see in ANTAC or other cases. But you couldn't provide before you mixed. You can't provide certain components. Could you mix before you provide? You can. If I'm going to mix first oligo, second oligo, target, and cleavage means, I could mix the cleavage means and the target and the plague acid, while I'm just finishing the synthesis of the first oligo and second oligo, and then add those in. There's no reason, by logic or language, and actually, the evidence is uncontradictory in the record, that one ordinary spill in the yard would read it the way I'm saying it. Now, what about damages? Damages, Your Honor, reasonable royalty. How can that include an up-front royalty? Case law, from this court, supports an up-front royalty as an appropriate measure of damages where the evidence supports it, Your Honor. In this case, there is agreement. Which case? Which side are you on? I can't remember the name of it. I apologize. It has one of those very long names. I apologize. Here, the evidence is, in the biotech industry, that up-front payments are common. It's not just our expert. It's their expert, as well, that indicated that there were up-front payments in this industry. Does that constitute reasonable royalty? Sure, they may be common as part of a deal, but looking backwards, are they reasonable royalty? For quite a short period of time. Let me address first the concept of up-front payment. I would say, yes, that's reasonable and appropriate under the circumstances in this industry for this type of technology that people would agree to a license with an up-front payment. Isn't your strongest argument that that's what the jury found? Well, the jury heard all this evidence. They heard the evidence, and there's substantial evidence on the common aspect in the industry. They heard evidences to the magnitude. And the jury didn't pick a high-end number. They didn't pick a low-end number. They picked a number in the middle that was actually less than a third-rate expert testified was the number that would have been agreed to by the parties. So the jury picked a number within the range of numbers and data and information presented. That information included evidence about the Tappan reaction, although they've complained and said it's not comparable. They actually tout that it's A5025 in the appendix, the comparability of their technology, which is infringing and therefore patented technology. Didn't the Tappan strategy think they weren't infringing? Were they proceeding as if they weren't infringing? The jury found they didn't have a reasonable basis for believing they didn't infringe. So I don't know what was actually in their minds, but the jury found otherwise. So the data and the evidence on the images supports fair compensation in a third way in the amount that was awarded. The jury heard all the arguments about whether a reasonable corporation or whether a strategy would agree to this, and it's only 18 months, and so on and so forth, and rejected it. As far as the evidence that the license is only for 18 months and the jury takes it from 11 to patent, is that reasonable or unreasonable? The information that was presented to the jury was that this would be an 18-month license, and there's no reason to expect the jury to do anything other than what they were asked to do with respect to the evidence presented and the questions asked. Let me interrupt you. At the end of your time, I'm going to give you up to three minutes more because we're giving this only three minutes. Mr. Thompson, let me ask you one question. Turning to the issue of claim construction, what happens in this case if this panel, speaking hypothetically, were to disagree with the district courts' claim construction and the one you urge and the documents you release, what does that mean happens in the case? Does it mean it goes back? Does it mean judgment gets entered in favor of strategy? What would be your view on that? I know that's an eventuality that you do not favor, but given the issues and the parameters of the case, it's one we have to hear what your views are. Globally, it encourages parties to take do-overs on claim construction and concede them to raise their arguments later. Here what it does is it has, I think, a different effect on different components of the case. I think they still infringe. If you can't start the mixing stuff until all four ingredients have been provided, I still think they infringe. But that's an issue that I think realistically is probably one for the district court to consider in the first instance. From an invalidity standpoint, I don't think any of their invalidity arguments depend on the claim construction. I think those could stand. I think they should stand. From a damages standpoint, I don't think the damages determination depends on the claim construction. If they're ultimately bound to infringe, I see no reason why damages should be affected. And then the last component, they raise their enhanced damages and attorneys' fees. I think realistically, those would probably be reconsidered by the district court. So we could affirm on the claim construction, send it back and restructure the damages? If the issue were with respect to damages, then I believe the answer is correct, Your Honor. It would be sent back. My understanding is sent back to the district court to address damages either on the amended or removed file, or an option either. Thank you. Thank you, Mr. Towns. Three minutes. Let me start off, Mr. Lee, by quoting something from the district court's opinion. We're always looking for good literature in district opinions. The sheer effrontery of this assertion is breathtaking. I know you were not trial counsel, but... I think I know what you're going to read, though. And your answer to that is what we were talking about before, which is the best you've got. Your Honor, I don't think... I think it... I offered it because it was specific, but in part in answer to Judge Schall's question, Ms. Pirozola reminded me that in fact, at our reply brief at page three, we also identified in response to the appeal, portions of page 713, 726, 729, where we made the argument. And what Your Honor will see is, is expressed in this argument, can you mix them? Can you provide them if they are made in situ? And it's explicit a half a dozen times. Now, without a doubt, trial counsel and the district court got off the rails with each other. That's a non-apprehension, though. No, Your Honor, because what we say is, we'll say that it says cannot be provided as defined by these claims. So it is, yes, a non-apprehension argument, but one that's dependent upon claim interpretation. So we, in fact, refer to the reply to some of the pages that Judge Schall identified. What's your response, Mr. Lee, to Mr. Powell's contention that the material at page 712 through 713, and I guess 730 through 733, does not, in fact, speak to what I'll refer to by way of shorthand as the providing-slash-mixing issue? You heard what he said. I did. In fact, Your Honor, you'll find at page 713 that we specifically address that issue, and the same is true at 726, the same is true at 729. So this question of whether they... Where do you address it at 713? 712 through 713, precisely. It's important, because he says, no, no, you don't at that point, or that strategy didn't at that point. Let me give you the precise quotes, Your Honor, and I can just get our reply. At page 713, we say, first, strategy does not provide either of the two required alternative mechanics. That's headed by the heading in the paragraph, strategy's products cannot infringe. Right. It doesn't sound like a claim-destruction challenge. Well, Your Honor, it's... infringement has to implicate both claim interpretation and the fact. What about us at the bottom of 712 going over to 713? Oh, I'm sorry. I took the 713. You mean, as discussed here on the claims, must be construed to require a fully-complementary algorithm for the ties? Is that the... That paragraph, going over to 713. That is... That actually is... leads into the argument, but I think Mr. Tallis is correct This goes to more of the overlap argument that results from anticipation. Okay, now what about at 730 through... Well, I guess I'm looking at 732 through 733. Specifically, the paragraph begins, therefore, if the court were to observe. I think that does relate, Your Honor, because it builds on what's on page 729, and at page 729, our quote is, quote, a primer extended by ephemeris never infringes the patents in suit because it cannot be produced prior to the end of the mixing step. That's at 729? Yes, that's at 729. Which paragraph is that? I don't know. Sorry, I... No, that's... No, this is... They're down in the mud here on these... I see evidence, but they're important, Your Honor. I think they're muddy issues. What? Oh, I see, up at the top. Up at the top, right. Then it moves into a question of incorrect infringement. Okay, so you're saying 729 sets up what you say at 732 through 733. That's correct. And, Your Honor, I think... Let me just make two... Very quickly, three final points. This difference in the claim interpretation really is emphasized by the anticipation arguments. If our claim interpretation is correct and it cannot form an in situ, then the difference between the pioneering technique work and this work is that the oligos are reformed. Second point. Second point is the issue is not as Mr. Powell has described, which is what's formed, tiger mixing, what else. It's a question of whether we can form the oligos in situ. And we're going to call to the Court's attention column 27, lines 37 to 43, of the 543 patent that specifically talks about decoupling synthesis from the mixing reaction. Column 27. Column 27, lines 37 to line 44, which says, the ability to uncouple the synthetic activity, the enzyme from the 5' nuclease activity proves that the 5' nuclease activity does not require concurrent DNA synthesis describing the invention. Last point. There are up-front payments in the area of biotechnology, but they're up-front payments when you're getting a license for the term of the patent. This is not an area that the Court has addressed in any detail, but the problem with up-front payments, particularly when you're comparing them to licenses to the extent the lifetime of the patent is, it's double-dip. Presuming an up-front payment that would extend throughout the lifetime of the patent, when you're in a circumstance where the injunctional issue before the lifetime has been exhausted results in a double recoupling, that's what's occurred here. I understand your points, in case the Court will allow you. Thank you, gentlemen, on the case for taking up this issue.